Filed 9/25/14  Felix Costa & Sons v. Ross CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FELIX COSTA & SONS, etc. et al., | |
| Plaintiffs and Appellants, | C069389 |
| v. | (Super. Ct. No. 03AS03433) |
| KAREN ROSS, as Secretary, etc., | |
| Defendant and Respondent. | |

This case presents an equal protection challenge to the California Cherry Marketing Program (Cherry Marketing Program or Program), established in 1993 pursuant to the California Marketing Act of 1937 (CMA) (Food & Agr. Code, § 58601 et seq.).[1]  The Program requires packers and growers of four varieties of cherry (Bing, Van, Lambert, and Rainier) to pay an assessment to fund research and marketing efforts

---

[1]     Undesignated statutory references are to the Food and Agriculture Code.

1

designed to benefit the assessed varieties. Plaintiffs Felix Costa & Sons, Felix Costa, and a partnership comprised of Felix Costa, Greg Costa, and Jane Armstrong (the Costas) sued Karen Ross, in her official capacity as Secretary (Secretary) of the California Department of Food and Agriculture (Department), alleging the Program violates their right to equal protection under the law and further alleging the Secretary failed in the statutory duty to ensure uniformity in the inspection of cherries. Judgment was entered in favor of the Secretary after the trial court granted the Secretary's motion for summary judgment and denied the Costas' motion to amend the complaint to assert an additional cause of action alleging the creation of the Program was not a valid exercise of the state's police power.

On appeal, the Costas assert: (1) the trial court abused its discretion in depriving the Costas of the opportunity to amend the complaint to assert the police power claim; and (2) the trial court erred in granting the Secretary's summary judgment motion with respect to the equal protection and inspection claims. We affirm the judgment. As we explain, the trial court did not abuse its discretion in denying the Costas' motion to amend the complaint. The Costas' unwarranted delay in proposing an amendment that would interject a new issue requiring new discovery provides ample justification for denial of the motion. Nor did the trial court err in granting the Secretary's summary judgment motion. With respect to the Costas' equal protection claim, as a matter of law, growers and packers of assessed and non-assessed varieties of cherry are not similarly situated for purposes of the Cherry Marketing Program. With respect to the inspection claim, there is no factual dispute concerning the manner in which the Secretary enforces the standards found in the California Code of Regulations (CCR), i.e., through a spot inspection program. We conclude the use of spot inspections to enforce

2

the standards does not violate the Secretary's obligation to ensure uniformity in inspections.

BACKGROUND

*California Marketing Act of 1937*

The CMA "constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the [Secretary]. [Citation.] It grew out of the chaotic conditions which characterized California agriculture during the early part of the twentieth century. [Citation.] Before the promulgation of the CMA, each of California's many fruit and vegetable growers attempted to be the first in the market with his or her commodity, in order to take advantage of the premium prices paid on early shipments. This led to the marketing of inadequately ripened produce, and the glutting of the market during the peak season with poor quality commodities. Deceptive packaging, improper sampling, and false grading were often resorted to in order to attempt to enhance the attractiveness of the produce. This 'unregulated scramble' had an 'adverse effect upon consumer acceptance of California fruits and vegetables,' and the unstable and fluctuating markets 'had an exaggerated impact on the livelihood of' the state's agricultural producers. [Citation.] The depression of 1929–1933 only exacerbated these problems; the prices paid to growers 'plummeted.' [Citation.]" (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 907.) Similar concerns prompted the United States Congress to enact the Agricultural Marketing Agreement Act of 1937 (AMAA). (June 3, 1937, ch. 296, 50 Stat. 246 et seq., as amended, codified at 7 U.S.C. § 601 et seq.) (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 476 (*Gerawan I*).)

Like its federal counterpart, "the CMA declared, as one of the Legislature's policies, the establishing and maintaining of orderly marketing conditions for agricultural

3

commodities in order to raise and support prices for their producers." (*Gerawan I*, *supra*, 24 Cal.4th at p. 478.) Also like the AMAA, "the CMA authorized the [Secretary] to issue 'marketing orders,' i.e., regulations governing marketing matters for the producers and handlers of agricultural commodities, which did the following: provided for participation in the administration of such orders by the regulated producers and handlers themselves; substantially restricted the terms of such orders generally to, among others, the determination of the existence and extent of any surplus, the limitation on total quantity marketed, the allotment of amounts for purchase, the allotment of amounts for marketing, the regulation of periods for marketing, the establishment of reserve pools, the institution of grading and standards, and, impliedly, the conduct of research; and mandated that the regulated producers and handlers had to contribute funds to cover related expenses. It contained provisions relating to the termination of such orders, their coming into effect, and, impliedly, the conduct of referenda. In light of features of this sort, the mechanism of regulation that such an order sets up is, essentially, self-regulation by the regulated producers and handlers themselves. [Citation.]" (*Id*. at pp. 478-479.) However, "unlike the AMAA, the CMA authorized the [Secretary] to impose, among the terms of such a marketing order, the establishment of 'plans for advertising and sales promotion to create new or larger markets for agricultural commodities,' specifically, plans that are 'directed toward increasing the sale of such commodity without reference to a particular brand,' etc. (Stats. 1937, ch. 404, § 1, pp. 1335–1336.) It mandated that the regulated producers and handlers subject to a marketing order with such a term had to contribute funds to cover related expenses." (*Ibid*.)

### *California Cherry Marketing Program*

In 1993, the Secretary of Food and Agriculture was approached by the San Joaquin Valley Cherry Shippers Association concerning issuance of a marketing order for

4

cherries.  At the time, proponents of the order were concerned about the continuing profitability of the cherry industry.  As Glenn E. Yost, Senior Agricultural Economist with the Department's marketing branch, explained:  "In the past, cherries, being the perishable commodity that they are, could not be shipped out of the area where they were produced.  With the advances that have been made in the past ten plus years in postharvest handling and cold storage, a much larger market area is now possible.  California cherries are now shipped in refrigerated vans, to all major markets in the United States.  They are also shipped, mainly by air, to European countries and to the Pacific Rim.  Japan alone takes about 35 percent of the California cherry crop.  The industry is operating profitably at this point.  However, the industry's prosperity has prompted new cherry plantings.  It is possible that California production could double within the next five years.  The industry feels that it must promote and establish larger markets for this increased volume."  The proposed order would create an advisory board (Cherry Board) with authority to engage in the activities of sales promotion, market development, and general research for cherries of the Bing, Van, Lambert, and Rainier varieties.  It would also impose an assessment on packers of these four varieties in order to fund the Cherry Board's promotional and research activities.

Pursuant to the CMA, a public hearing concerning the proposed order was held on March 8, 1993.  (See §§ 58771, 58782.)  About 30 growers, packers, and/or shippers of cherries were in attendance.  All testifying attendees, including Greg Costa, partner of Felix Costa & Sons, were in favor of the proposed order.  With respect to limiting the proposed order to the four varieties specified above, Bob Chinchiolo, of the Chinchiolo Fruit Company, testified:  "The intent of the [Cherry Marketing Program] is to promote only bings, vans, lamberts, and rainiers cherries.  And the reason for making these distinctions are as follows:  The bing is . . . the primary cherry in California.  It makes up

5

and represents about 90 percent of all the cherry shipments out of California. [¶] And due to climatic conditions, the bing cherry is grown north of Modesto in the San Joaquin Valley, and in the coastal regions of Gilroy and Hollister, Morgan Hill, and Santa Clara. [¶] And the proponents feel that the bing cherry faces the greatest marketing challenges ahead, and it is the intent of the [Cherry Marketing Program] to base their promotional funds on the bing cherry primarily, at least initially. [¶] The vans, and the lamberts, and the rainiers, the other three varieties are much smaller in sales volume, but they were included because these varieties are also being shipped to Japan, and this makes the promotional programs simplified because now we can promote in Japan for those four varieties." At the time, these were the only varieties of cherry accepted by Japan for import into that country. These varieties also ripened later than varieties not included in the proposed marketing order.

Following the public hearing, in accordance with the CMA, the Secretary found the proposed marketing order to be "reasonably calculated to attain the objectives which are sought in such Marketing Order," that it was "in conformity with the provisions of the [CMA] and within the applicable limitations and restrictions which are set forth in said Act and will tend to effectuate the declared purposes and policies of said Act," and "[t]he interests of consumers of California cherries are protected in that the powers of said Act are being exercised only to the extent which is necessary to obtain such objectives." (See § 58813.) The Secretary then held a referendum of packers affected by the proposed order, a supermajority of whom voted in favor. (See § 58991.) The Cherry Marketing Program, became effective April 27, 1993. It was amended later that year, also by referendum, to include growers of the assessed varieties.

*Continuation Hearings*

The Cherry Marketing Program expressly provided for a public hearing in 1997 "to determine whether the Program is effectuating the purposes and provisions of the [CMA]," with additional public hearings to be held every five years in accordance with section 59086.[2] At the March 19, 1997, public hearing, about 20 growers, packers, and/or shippers of cherries were in attendance. All testifying attendees were in favor of continuing the Program. After finding "a substantial question does not exist as to whether the Program is meeting the declared purposes of the [CMA]," the Secretary, acting through the chief of the marketing branch, approved the continuation of the Program without holding a referendum.

The second public hearing on continuation of the Cherry Marketing Program was held on March 11, 2002. All testifying attendees were in favor of continuing the Program. Greg Costa, while generally in favor of continuing the Program, objected to the following sentence contained in article III, section B: "In carrying out the provisions of

---

[2] Section 59086 provides: "A marketing order shall not be submitted for reapproval until one year after the original enactment, or within one year of any prior approval. However, if no provision is made in any marketing order for reapproval or for termination in less than five years, the director shall at least once each five years hold a hearing, duly noticed and held in accordance with the provisions of this chapter. If the director finds after the hearing that a substantial question exists as to whether such marketing order is contrary to, or does not effectuate the declared purposes or provisions of this chapter within the standards and subject to the limitations and restrictions which are imposed in this chapter, such marketing order shall be submitted for reapproval. The vote for reapproval shall be the same as used for original approval of a marketing order. The director shall determine whether such approval shall be by assent or referendum. An amendment to a marketing order which extends the term thereof shall be deemed a reapproval of the marketing order. A marketing order which within five years prior to the effective date of this act has been amended to fix or extend its term shall be deemed to have been duly reapproved."

this Marketing Program, the Advisory Board will not be empowered to enact any form of quality and/or grade standards." He explained: "I just wanted to begin by saying that we at Felix Costa & Sons, are in favor of the Cherry Marketing Program or a body such as the [Cherry Board]. [¶] We feel very strongly that the present [Cherry Board] has done a good job of representing the industry's interests and concerns. They've done a good job in research and they've done a good job in marketing and promotion. [¶] We do, however, strongly oppose [the Department] authorizing the program to continue another five years in its present form, without having the issue brought to a vote."

Turning to his opposition to the above-quoted language, Greg Costa explained: "Felix Costa & Sons, and other packers that submit their entire production to a shipping point, continuous inspection program, and only produce and ship fruit in compliance with [the CCR], we are basically forced to support the marketing of fruit that does not always meet [the regulations] and to support packers who have produced this fruit that is not in . . . compliance." He continued: "[T]he existing program . . . does not allow the cherry industry to address and utilize the most powerful tool in moving the crop and improving the average returns to all growers that we have, and that is a mandatory minimum quality standard." Citing an article in "Good Fruit Grower," Greg Costa argued: "The research supports the fact that consistent predictable quality is even more important than promotion. And I'm required under law to pay money for the promotion of this product, and I find it hard to accept that there are people who feel it's okay to force me to pay money to promote product, and yet they will not obey the law." Finally, noting "disagreement within the industry" on the grade issue, he requested a vote on continuation of the Program and stated: "It would actually be our desire that the entire [Cherry Marketing Program] as it presently exists, be enacted with the exception of that one sentence [in article III, section B]."

In a hearing report issued by the Department, the author elaborated on the disagreement within the industry concerning grade and quality standards: "[T]he marketing order document pertaining to the [Cherry Marketing Program] currently prohibits the Program from engaging in grade and quality standards. Apparently when the Program was being implemented, the need for promotion and research efforts were of great importance to the industry. However, grade and quality standards were authorities the industry could not agree to incorporate into the program. Therefore, a prohibition on grade and quality standards was incorporated into the Program, so the industry could move forth unhampered with what it could agree to do, which is promotion and research. [¶] Though there is a prohibition in the Program, there are grade standards for cherries, under the [CCR]. According to testimony there is a problem with enforcement of [the regulations] for cherries at the State and county levels. It was felt by one grower-packer that the lack of enforcement of the [regulations] for cherries could hinder [the] Program's promotion efforts in all markets. [¶] The issue of incorporating grade and quality standards into the Program has been brought up among the [Cherry Board] members at various times throughout the life of the Program. Discussion first arose in the fall of 1996 and then again in the fall of 2000. At those times, the [Cherry Board] determined not to deal with the grading issue. However, at its meeting on March 14, 2002, the [Cherry Board] took action to place the topic of major [amendment to] the Program to include grade and quality standards authority within the Program on its next meeting agenda. The [Cherry] Board also submitted this action for inclusion into the hearing record."

The hearing report continued: "There is no industry consensus on this issue. The following summarizes the industry's testimony as it relates to incorporation of grade standards and continuation of the Program: [¶] Some industry members indicated that

9

they are strictly opposed to incorporating grade standards into the Program and feel the Program should continue as is. [¶] There is also support for incorporating grade standards into the Program by some industry members, though a majority of those supporters for quality standard[s] feel the continuation of the Program should not be jeopardized over this issue. Most feel the major amendment process is a means to effectively deal with this issue. [¶] Many industry witnesses who did not indicate their preference for incorporating grade standards into the Program, did however, express that the issue should be dealt with separately from the continuation process."

The Secretary, acting through the chief of the marketing branch, approved continuation of the program without holding a referendum, finding no "substantial question exists as to whether the [Program] is contrary to or does not tend to effectuate the declared purposes or provisions of the [CMA] within the standards and subject to the limitations and restrictions which are imposed in the [CMA]."

The third public hearing on continuation of the Cherry Marketing Program was held on January 17, 2007. At this hearing, of the twelve industry members providing testimony, seven supported continuation, three opposed, one provided mixed testimony, and one took no position on whether the Program should continue. In addition to arguing the Program should not continue unless amended to include grade and quality standards, Greg Costa (along with his employee, Rich Handel, and two others) argued: "The activities that the [P]rogram performs benefit the whole cherry industry, however, only four varieties are assessed. The assessed varieties represent only 65% of the industry, but carry the whole burden of paying assessments. This is unfair and therefore, the Program should not continue in its current form."

Finding the hearing record to be insufficient to determine whether there was a substantial question as to whether the Program was effectuating the purposes of the

10

CMA, the Secretary held a referendum of growers and packers, a supermajority of whom voted in favor of continuing the Program in its current form. Based on this referendum, the Secretary continued the Program for another five years.

### *Original Complaint and Stay of Proceedings*

On June 20, 2003, between the second and third continuation orders, the Costas sued the Secretary alleging payment of the assessment to fund the Cherry Board's promotional activities violated their free speech and free association rights under the state and federal Constitutions. At the time, *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1 (*Gerawan II*), involving the proper test to be used in determining whether a particular marketing order compelling funding of a generic advertising program violates the free speech clause of the California Constitution, was pending before the California Supreme Court. Because of this, the parties stipulated to having the case stayed pending resolution of the issue by our Supreme Court. Following issuance of the *Gerawan II* decision, the parties stipulated to continuation of the stay while the United States Supreme Court decided *Johanns v. Livestock Marketing Assn.* (2005) 544 U.S. 550 [161 L.Ed.2d 896] (*Johanns*), involving whether the generic advertising at issue there was the Government's own speech, and therefore exempt from First Amendment scrutiny. Ultimately, the Supreme Court held that is was. (*Id*. at pp. 560-567.) The case was further stayed pending resolution of *Gallo Cattle Co. v. Kawamura* (2008) 159 Cal.App.4th 948 (*Kawamura*), in which we applied the reasoning of *Johanns* to uphold milk producer assessments for generic milk advertising against a challenge under the free speech clause of our state Constitution. (*Id*. at p. 951.) The stay was lifted February 3, 2010.

11

### First Amended Complaint

On July 12, 2010, the Costas filed an amended complaint reasserting the free speech causes of action and adding two additional causes of action. The first of the new claims alleged the Cherry Marketing Program violated the Costas's right to equal protection under the law. Specifically, the Costas alleged: "Between 30% and 40% of all fresh cherries produced, packed and marketed from cherry orchards in California are not subject to the Cherry Marketing [Program]. However, those varieties compete in the market place, and compete in and around the same time that the four 'regulated' and assessed varieties are harvested, yet those varieties are not subject to assessments of the Cherry Board. In addition, [the Costas] allege that the Cherry Board's advertising, promotion and marketing indicates to the public to simply buy California cherries, that they are healthy, nutritious, now being sold, and worthy of the consumer's attention and expenditures, which discriminates against those like [the Costas] who produce and ship assessed varieties. [¶] . . . [The Costas] contend that leaving the vast majority of cherries unregulated as to assessments, but equally applauded and promoted by the Cherry Board in its advertising and promotion, violates [the Costas]' equal protection rights, because the Cherry Marketing [Program] is arbitrary, capricious and discriminatory."

The second of the new claims alleged the Secretary failed in the statutory duty to ensure uniformity in the inspection of cherries. Specifically, the Costas alleged: "Pursuant to [sections] 42651 through 42683[,] the Secretary . . . is required to [e]nsure uniformity in inspections, and that any local, county, or other inspectors employed to perform inspections regarding the grades and standards for California cherries, the Secretary is required to order them to uniformly apply the [CCR] standards for cherries. [The Costas] allege that there is no uniformity in the inspections, that cherries that would fail at [the Costas]' packing facility, are passed at competitor's facilities, that [the Costas]

12

have routinely complained to the Secretary about this lack of enforcement, and the Secretary has refused to enforce the . . . regulations uniformly."

### *Standardization and Shipping Point Inspection Programs*

To place the Costas' inspection claim in context, we briefly describe the Department's commodity inspection programs: (1) the standardization program; and (2) the shipping point inspection (SPI) program. These programs are not part of the Cherry Marketing Program.

The standardization program "is responsible for the enforcement and maintenance of minimum standards for quality, maturity, container, marking size, and packing requirements. The goals of the Program are to remove substandard agricultural products from the channels of trade, to assure consumers that they are purchasing commodities at a level of acceptable quality, and to protect and promote the fruit, nut, vegetable and honey industries of California. The Program also promulgates and processes regulations concerning standardization of quality, maturity, containers, labeling and packing requirements." The standardization program "is currently enforced through a spot inspection program" carried out by both state and county inspectors. County inspectors "conduct the vast majority of these inspections" and are licensed through the Department. Seasonal inspectors may also be employed by the counties and must pass a "commodity specific" training course.

The SPI program "provide[s] inspection services for higher voluntary quality standards, such as the USDA's quality standards for cherries. Commodity packers who wish to document that their products meet these higher standards will hire SPI to be present w[h]ile the products are packed and to grade the products according to the standards that the packer is trying to meet. Because the role of SPI is to enforce these higher voluntary standards, SPI does not have authority to issue notices of

noncompliance" with CCR standards. However, "SPI can provide information to the county officials [enforcing the standardization program] who could then take regulatory action when applicable. Accordingly, SPI, Standardization and the County Agricultural Commissions have entered into MOUs providing that SPI will call the local county inspector if it sees a potential problem."

### *Summary Adjudication Motion*

On October 5, 2010, the Secretary filed a motion for summary adjudication of the Costas' free speech claims relying on *Johanns*, *supra*, 544 U.S. 550, *Kawamura*, *supra*, 159 Cal.App.4th 948, and similar decisions from the United States Court of Appeals for the Ninth Circuit. The Costas opposed the motion, arguing the Cherry Marketing Program was distinguishable from the advertising programs at issue in the cases relied upon by the Secretary because "none of the programs were attacked therein as beyond the 'police power' of the Legislature or Congress." Thus, for the first time in opposition to the Secretary's motion for summary adjudication, the Costas claimed the Cherry Marketing Program was an unconstitutional exercise of the state's police power, arguing that "[r]equiring some variety of cherry producers to fund the promotion and advertising of cherries has 'no real or substantial relation' to either public health, safety or morals." The Costas further argued the Legislature could not delegate its police power to the Secretary, "let alone the absurdity of abdicating the 'police power' authority to a few cherry producers who pick and cho[o]se which varieties to be regulated and which varieties to be left alone," and that the Secretary failed to make certain required findings before issuing the marketing order.

The trial court granted the summary adjudication motion on December 1, 2010. With respect to the Costas' police power arguments, the trial court stated such a claim did

"not form any part of the causes of action of the First Amended Complaint to which the motion for summary adjudication is directed."

### *Motion to File Second Amended Complaint*

On April 1, 2011, the Costas moved to file a second amended complaint. The proposed complaint reasserted a cause of action alleging violation of the Costas' free speech rights under the California Constitution "in order to preserve that cause of action for appeal," reasserted the Costas' equal protection and inspection causes of action, and asserted a new cause of action alleging the Cherry Marketing Program to be an unconstitutional exercise of the state's police power.

In opposition, the Secretary argued the motion should be denied because: (1) the Costas were not diligent in seeking to amend the complaint to assert the police power claim; (2) allowing the amendment would prejudice the Secretary by forcing her counsel to ascertain the factual basis for the new claim, address the new claim in a summary judgment motion the parties agreed would be filed May 13, 2011, and rework her trial strategy should summary judgment be denied, all "at considerable expense"; and (3) Greg Costa's deposition testimony "establishes that [the Costas'] proposed claim lacks merit."

In reply, the Costas argued the Secretary's opposition ignored "the policy of great liberality in permitting amendment at any stage of the proceedings, up to and including trial." The Costas also argued, "more liberality" should be given in this case because the proposed amendment "simply adds a new legal theory"; and because the new theory "is a novel question certain to be tested in the appellate court, the preferable practice is to allow the amendment and permit the parties to test its legal sufficiency by demur[rer] or other appropriate motion." The Costas also assured the trial court there would be no objection "to a continuance of the trial date in order to allow the Secretary to continue [with] discovery." Finally, the Costas argued the Secretary would not be prejudiced by

15

the amendment because: (1) the Secretary knew since the hearing on the summary adjudication motion that the Costas intended to amend the complaint to assert a police power claim; (2) the discovery cut-off date was over two months away, "plenty of time" for discovery regarding the new claim; and (3) the Secretary had already served a set of interrogatories and demand for production relating to the new claim.

### *Motion for Summary Judgment*

On May 13, 2011, the Secretary filed a motion for summary judgment. With respect to the equal protection claim, the Secretary argued a rational basis existed for limiting the Cherry Marketing Program to the assessed varieties. Beginning with the 1993 public hearing on adoption of the Program, the Secretary argued: "There, the industry testified that Bing cherries represented 90% of California's cherry shipments and faced the greatest marketing challenges of any cherry variety. Additionally, at that time, only Bings and three other California varieties, Vans, Lamberts, and Rainiers, had been approved to be shipped to Japan. Given conditions in the industry, together with the new marketing opportunity, California's cherry packers wanted to create a [Cherry Marketing Program] that would place a large emphasis on promoting the kinds of cherries that could be shipped to Japan, a potentially lucrative market. Industry representatives testified that the inclusion of the four Assessed Varieties in the [Cherry] Marketing Program would enable them to promote all four of those varieties in Japan."

Acknowledging that, in the meantime, Japan had opened its doors to other varieties of cherry and production of non-assessed varieties had grown significantly, the Secretary argued a rational basis for the distinction continued to exist: "[D]espite these changes, there continues to be a rational basis for limiting the [Cherry] Marketing Program to the Assessed Varieties because . . . the Assessed Varieties and the non-assessed varieties are grown in different regions and reach the market at different times,

16

with the non-assessed varieties ripening and reaching the market earlier than the Assessed Varieties. . . . The Secretary could reasonably believe that the Assessed Varieties face greater marketing challenges than do the non-assessed varieties because the non-assessed varieties have an inherent marketing advantage since they reach the market first. The Secretary could reasonably believe that it is more difficult to move the large volumes of Assessed Varieties reaching the market later in the season, and that the Assessed Varieties face greater marketing challenges than non-assessed varieties because the Assessed Varieties face greater competition from cherries from other regions, such as the Pacific Northwest."

With respect to the inspection claim, the Secretary argued: "[The Costas] assert[] that the present enforcement program is not uniformly applied because not all cherries are inspected, but lack of uniformity does not necessarily follow from a program such as the spot inspection program used by the Secretary and the county agricultural commissioners. It is normal for a spot inspection program not to capture all non-compliant cherries, but that does not mean the Standardization Program is not uniformly enforced. Indeed, [the Costas'] own testimony and the other undisputed evidence reveals that the Standardization Program is being enforced against all packers, not just [the Costas], and that [the Costas are] not treated any differently from the other packers."

In opposition, with respect to the equal protection claim, the Costas argued all cherry producers are in a "like class" for purposes of the Cherry Marketing Program regardless of the varieties produced, as evidenced by the fact that production and shipment of non-assessed varieties grew from 6 percent in 1994 to 54 percent in 2010. The Costas argued the fact that Japan had initially opened its doors to only the four assessed varieties could not be used as a rational basis for the disparate treatment because, by 1998, more than half of the packages shipped to Japan were of the non-

17

assessed varieties, and by 2010, the non-assessed varieties shipped to Japan exceeded the assessed varieties.[3]  With respect to the inspection claim, the Costas argued, "there are numerous disputed issues of material facts" regarding whether the Secretary is adequately enforcing the inspection provisions of the Food and Agriculture Code.  Despite framing the cause of action as a violation of the provision requiring uniformity in inspections, the Costas conceded they are not "singled out for different treatment," and then argued: "[The Costas are] claiming that because of the lack of inspectors, the lack of uniformity, and the 'spot' inspections there are really junk cherries hitting the market when [the Costas'] much-better-quality cherries go out to the same market which causes substantial problems, and it's the Secretary's obligation to [e]nsure not only sufficient inspectors, but sufficient compliance with the regulations."

### Trial Court's Rulings on the Motions

The trial court denied the Costas' motion to file a second amended complaint, explaining:  "[T]he proposed new cause of action opens up an entirely new field of inquiry—the issue of whether the facts related to market conditions and general social conditions in 1993 justified the institution of a marketing order for cherries (and, presumably, whether such conditions justify its continuance today) as an exercise of the State's police powers—without any satisfactory explanation as to why this major element in [the Costas'] attack on the order had not been made long before trial."  The trial court also found the Secretary would "incur significant additional litigation expenses" if the amendment were allowed, and it would be unfair to the Secretary "to reshape the

---

[3]    Costa also took issue with the fact that the Secretary acted through the Department's chief of the marketing branch and senior agricultural economist in making the findings required by section 58813 and argued the Cherry Marketing Program was not a valid exercise of the state's police power.

18

litigation in such a significant manner when [the Costas] have no reasonable explanation for not asserting their claims much earlier." As an alternative ground for denying the motion, the trial court ruled the Costas' new cause of action "appears to lack merit."

The trial court also granted the Secretary's summary judgment motion. With respect to the equal protection claim, the trial court ruled: "[T]he statement of undisputed material facts the Secretary has offered in support of its motion with regard to the [equal protection claim], along with the evidence cited in support of those statements of fact as listed therein, demonstrate at least two rational bases for the Marketing Order's focus on certain varieties of cherries. The first such rational basis consists of the Secretary's conclusion, based on information received from persons in the industry at the time of the Order's inception, that the assessed varieties alone required special marketing support given the newly-available ability to market those varieties (and, at that time, apparently, no others) in Japan. As time went on (and as Japan opened its door to the importing of additional varieties of cherries), a further rational basis for the Order's focus on the assessed varieties emerged, which was that those varieties ripened later than the non-assessed varieties, and thus were subject to competition from later-ripening cherries originating outside of California, thus justifying additional marketing support. While these justifications for the Order may be debatable as matters of policy, the Court cannot find, as a matter of law, that they have engendered wholly arbitrary or irrational classifications, or that they are demonstrably irrelevant to the legislative goal underlying the Marketing Order, which is the promotion of California-grown agricultural commodities in domestic and foreign markets. Both are reasonably conceivable states of facts, and plausible explanations, to support the Marketing Order's classifications."

With respect to the inspection claim, the trial court ruled: "[T]he (undisputed) fact that the cherry Standardization Program is enforced through 'spot inspections' that result

19

in the inspection of a small percentage of the total amount of cherries being packed, rather than through a more comprehensive inspection program that might reach more of the crop, does not establish that the Secretary has failed to enforce cherry standards in a uniform manner.  In fact, the facts and evidence demonstrate that the Secretary has established an inspection program that operates in a uniform manner as to all packers.  Plaintiffs have not shown otherwise.  At most, they have shown that they disagree with the inspection method the Secretary has chosen to use on the basis that they believe that another method would be more effective and comprehensive.  Such a disagreement over the method, however, does not establish that the Secretary has failed to comply with the law requiring uniform enforcement."

## DISCUSSION

## I

### *Denial of the Motion to Amend the Complaint*

The Costas contend the trial court abused its discretion when it denied the motion to amend the complaint.  We disagree.

" '[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown.  [Citations.]' " (*Record v. Reason* (1999) 73 Cal App.4th 472, 486; Code Civ. Proc., § 473, subd. (a)(1).)

While the trial court "must apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial, when no prejudice is shown to the adverse party" (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746), "[a] different result is indicated '[w]here inexcusable delay and probable prejudice to the opposing party' is shown." (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 487; *Estate of Murphy v. Gulf Ins. Co.* (1978) 82 Cal.App.3d

304, 311.) Indeed, " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' [Citation.]" (*Record v. Reason*, *supra*, 73 Cal.App.4th at p. 486.)

Denying leave to amend, the trial court ruled: "In the proposed new fourth cause of action, [the Costas] allege that when the California Marketing Act of 1937 was passed, the Legislature made no findings that cherries must be subject to the Act, and that there was no proper basis under the Act for instituting a marketing order for cherries nearly 60 years later, in 1993, because there was at that time no necessity for such an order to promote the public health, safety, or general welfare. This claim thus involves facts and circumstances of which [the Costas] were, or at least should have been, aware at the time of the institution of the marketing order in 1993, and certainly at the time of the filing of the original complaint in this action in 2003, particularly given the allegation in the proposed amended complaint that plaintiff Felix Costa has been in the business of growing cherries in California for approximately 50 years. [¶] Although [the Costas] arguably acted with reasonable diligence to seek leave to amend the pleading to add this cause of action beginning in November, 2010, they have not provided a satisfactory explanation why the cause of action was not explicitly asserted until that late point in the litigation. The facts supporting [the Costas'] claim that the Marketing Order was not justified by economic and social conditions at the time of its institution would have been known to them at that time, in 1993, and certainly at all times thereafter when the Marketing Order was in effect. [¶] Moreover, the proposed fourth cause of action opens up an entirely new field of inquiry—the issue of whether the facts related to market conditions and general social conditions in 1993 justified the institution of a marketing order for cherries (and, presumably, whether such conditions justify its continuance

21

today)—without any satisfactory explanation as to why this major element in [the Costas'] attack on the order had not been made long before trial."

The trial court continued: "With trial set to commence in this matter in just over two weeks, the prejudice to [the Secretary] should the amendment be permitted is clear. The proposed new fourth cause of action would inject significant new issues into the case, which have not been subject to motion practice. The trial date would have to be vacated so that further discovery, and possibly motions, could take place. This would cause further delay in a case that is already eight years old, and also would cause [the Secretary] to incur significant additional litigation expenses. It would be unfair and prejudicial to [the Secretary] to reshape the litigation in such a significant manner when [the Costas] have no reasonable explanation for not asserting their claims much earlier. [¶] Even though the parties voluntarily stayed this action for a significant period of time to await the resolution of appellate court cases involving the free speech and free association claims asserted in the complaint, that voluntary stay would not have prevented [the Costas] from seeking a stipulation or leave of court to add their police power claim at a much earlier date. Even though [the Secretary], in an excess of caution, has done some limited discovery regarding [the Costas'] proposed police power claim, the Court concludes that it would be unfair and prejudicial to permit amendment of the complaint to raise this entirely new and significant field of inquiry at this late date, approximately two weeks before trial is scheduled to begin."

Finally, the trial court explained: "Case law also indicates that leave to amend should be denied where it would be patently unfair to permit a party to defeat a motion for summary judgment by setting up a new claim that effectively turns the complaint into a 'moving target' [citing *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 176]. In this case, [the Costas] first raised their [police power] claim

when it became apparent that the Court would grant [the Secretary's] motion for summary adjudication in November, 2010. [The Secretary] has calendared a further motion for summary judgment for the same date as the present motion. [The Costas'] attempt to amend the complaint to add a new claim never asserted before in this case appears to be a last-ditch effort to stave off the inevitable by setting up a classic 'moving target.' The Court finds that it would be patently unfair to permit this to occur."

We adopt the trial court's reasoning as our own and affirm its decision to deny the Costas' motion to amend.

Nor are we persuaded by the Costas' arguments to the contrary. First, the Costas assert the proposed amendment "did not add a party, did not claim more damages, did not claim any totally unrelated issue or cause of action, but instead was based upon the same marketing order, the same Marketing Act of 1937, the same commonality of facts as the equal protection argument." This does not change the fact the proposed police power claim would add an entirely new legal issue to the case, i.e., whether or not the Cherry Marketing Program was at its inception, and continues to be, "reasonably related to the accomplishment of a legitimate governmental purpose." (*Birkenfeld v. Berkeley* (1976) 17 Cal.3d 129, 158.) Nor does the Costas' briefing on appeal attempt to justify the delay in asserting this new cause of action. (See *Green v. Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 692 ["unexcused delay is sufficient to uphold a trial judge's decision to deny the opportunity to amend pleadings, particularly where the new amendment would interject a new issue which requires further discovery"].)

The Costas also take issue with the trial court's statement that, "[w]ith trial set to commence in this matter in just over *two weeks*, the prejudice to [the Secretary] should the amendment be permitted is clear." (Italics added.) The Costas argue their "motion for leave to amend was originally set for hearing on April 22, 2011, approximately three

23

and a half <u>months</u> . . . before the scheduled trial date of August 1, 2011.  However, . . . the court requested it be rescheduled seven weeks later on June 10, 2011. . . .  The court requested the hearing on the motion to be heard at the same time as the Secretary's motion for summary judgment.  Even June 10 would have been over seven weeks before the trial, but on June 10, 2011 the court again continued the hearing on both matters until July 15, 2011 (two weeks before the scheduled trial)."  While true, the trial court's decision was not based solely on the fact that the hearing date was two weeks before trial was set to begin.  The decision was primarily based on the fact that the circumstances argued in support of the police power claim were known or should have been known by the Costas since 1993.  The Costas could have included such a claim when they filed their initial lawsuit in June 2003, and should at the very least have done so when they filed their first amended complaint in July 2010.  Again, the Costas present no argument attempting to justify waiting until April 2011 to add this new claim to the litigation.

The Costas also dispute the trial court's conclusion the proposed amendment would require further discovery, arguing:  "First, the Secretary had already engaged in discovery on the proposed fourth cause of action, deposed the two basic witnesses for [the Costas], did written discovery to which [the Costas] responded, and the Secretary could have included her 'facts' and argument in her motion for summary judgment (which was not filed until May 13, three weeks after the scheduled hearing date on the motion to amend).  Further, the Secretary could have used a demurrer or a motion for judgment on the pleadings with respect [to] that cause of action."  We are not persuaded.  First, the Secretary could not have added the police power claim to her summary judgment motion because the trial court ruled on the motion to amend and the summary judgment motion at the same time.  While, as the Costas point out, the motion to amend was filed six weeks before the summary judgment motion was filed, and while the

24

Secretary did engage in some discovery regarding the proposed new claim, it would be patently unreasonable to expect the Secretary to preemptively challenge the Costas' *proposed* police power claim in a motion for summary judgment, the scope of which is delimited by the pleadings (see *Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 477), which at that time did not include a police power claim. And even had the trial court ruled on the motion to amend before ruling on the summary judgment motion, granting the motion to amend would no doubt have necessitated a continuance to allow the Secretary to conduct additional discovery and add the police power claim to the summary judgment motion. This would have resulted in additional expense to the Secretary.

Second, to say the Secretary would not be prejudiced because she could challenge the police power claim on the pleadings assumes the proposed claim is insufficient to state a cause of action. If that is the case, denial of the motion to amend is fully supported on that basis alone. (See *Congleton v. National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 62.) And if the claim would survive a demurrer, then the Secretary would be put in the position of filing a *third* summary judgment motion to challenge this new claim, with the attendant expense of litigating such a motion. As the trial court ruled, prejudice is clear.

Finally, the Costas argue it is "mind boggling" for the trial court to have found "the new fourth cause of action would 'inject significant new issues into the case' " and then, "ironically," also find the "claim 'appears to lack merit.' " This is neither mind boggling nor ironic. However, having concluded the trial court did not abuse its discretion in denying leave to amend because of the Costas' unexcused delay, coupled with the fact the amendment would interject a new legal issue into the case, requiring the

25

Secretary to engage in further discovery, we need not pass on the likely merit of the police power claim.

## II

### *Grant of the Summary Judgment Motion*

The Costas also claim the trial court erred in granting the Secretary's summary judgment motion.  Not so.

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law.  [Citation.]  The burden of persuasion remains with the party moving for summary judgment.  [Citation.]" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*); Code Civ. Proc., § 437c, subd. (c).)  Accordingly, a defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (*o*)(2).)  Such a defendant also "bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists.  Once the initial burden of production is met, the burden shifts to [plaintiff] to demonstrate the existence of a triable issue of material fact." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1250.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn*, *supra*, 31 Cal.4th at p. 1003.)  "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny.  [Citation.]  We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the

party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

**A.**

***Equal Protection Claim***

Both the federal and California Constitutions prohibit the denial of "equal protection of the laws." (U.S. Const., 14th Amend.; Cal. Const., Art. I, § 7, subd. (a).) "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally." (*People v. Brown* (2012) 54 Cal.4th 314, 328; *In re Eric J.* (1979) 25 Cal.3d 522, 530.)

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged. [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) " 'If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]' [Citation.]" (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 434.)

Here, the law challenged is the Cherry Marketing Program. In order to determine whether growers and packers of assessed and non-assessed cherries are similarly situated for purposes of this Program, we must first determine the purposes of the Program. As previously stated, the Cherry Marketing Program placed an assessment on growers and packers of Bing, Van, Lambert, and Rainier cherries in order to fund "sales promotion,

27

market development, and general research for [the assessed] varieties." The Program was established in 1993 to address the concern among members of the cherry industry that an increasingly larger volume of cherries required greater promotion and establishment of larger markets for the increased volume. This purpose was in line with the CMA, which authorized issuance of marketing orders establishing " 'plans for advertising and sales promotion to create new or larger markets for agricultural commodities,' " to be paid for by contributions from the regulated growers and packers, and "declared, as one of the Legislature's policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices." (*Gerawan I*, *supra*, 24 Cal.4th at pp. 478-479.)

The reason four varieties were targeted, rather than all varieties of California cherry, was stated at the 1993 public hearing: "The intent of the [Cherry Marketing Program] is to promote only [the assessed varieties]. And the reason[s] for making these distinctions are as follows: The bing is . . . the primary cherry in California. It makes up and represents about 90 percent of all the cherry shipments out of California. [¶] . . . [¶] And the proponents feel that the bing cherry faces the greatest marketing challenges ahead, and it is the intent of the marketing order to base their promotional funds on the bing cherry primarily, at least initially. [¶] The vans, and the lamberts, and the rainiers, the other three varieties are much smaller in sales volume, but they were included because these varieties are also being shipped to Japan, and this makes the promotional programs simplified because now we can promote in Japan for those four varieties." At the time, these were the only cherry varieties accepted by Japan for import into that country. Thus, at least in 1993, it is clear growers and packers of assessed and non-assessed varieties are not similarly situated for purposes of a program designed to

28

promote only the assessed varieties, with an emphasis on market development in a country that accepted only those varieties.

Later, however, Japan opened its doors to additional varieties. And by 2010, over half of the shipments to Japan were non-assessed varieties. Nevertheless, there remains a valid distinction between the assessed and non-assessed varieties that prevents growers and packers of the two groups from being similarly situated for purposes of the Cherry Marketing Program. An additional reason for including only Bings, Vans, Lamberts, and Rainiers in the Program, stated during the 1993 public hearing, was that the varieties not included in the Program were typically harvested before the assessed varieties. As declared by Jim Culbertson, the Cherry Board's executive manager: "The assessed varieties are primarily Bing and Rainier cherries. Historically, the Bing cherry has been the standard cherry for the industry both in California and the Pacific Northwest. Bing cherries do not grow well in the warmer California growing regions because of the high temperatures during the summer growing season following harvest. Accordingly, California's Bings are generally grown in the Santa Clara Valley and the more northern regions of the Central Valley. Harvest of Bing cherries usually begins around May 15 and continues until the end of the California cherry harvest at the end of June. . . . Rainier cherries are in the market from May 10 until the end of the season. Vans and Lamberts, the other assessed varieties, were once a popular variety with many growers and were two of the four varieties approved for sale to Japan at the time the Cherry Marketing Program was proposed and ratified." "Van and Lambert cherries, although small in volume, are harvested and marketed in the later part of the California season." With respect to the non-assessed varieties, Culbertson explained these "varieties are early ripening varieties, and are grown in the warmer, more southern regions of the State.

They are generally harvested from April 25 until June 1. There are no cherries in the market prior to the first shipments from California."

At the 2002 continuation hearing, there was testimony that later-ripening varieties run into competition from cherries grown in the Pacific Northwest, particularly when there is a late harvest. Culbertson explained: "The Pacific Northwest cherry season will usually begin around June 5 and hit peak daily shipment volumes by July 1. Many seasons, California late season producers of assessed varieties must compete in the market place with cherries from the [Pacific] Northwest." Accordingly, the Cherry Board's "domestic cherry promotion activities have been driven for many years by featuring retail support during the peak production period for the assessed varieties of California cherries, May 25 through June 20. The Board focuses on this period because it wants to ensure that the Board's program benefits assessed varieties, with only incidental benefit to non-assessed varieties. The industry over the years has felt that the early-season, non-assessed varieties, with their lack of competition and modest production volume marketed over a month long period, did quite well without promotional support."

There is no dispute that assessed varieties ripen later than non-assessed varieties. Nor is there any dispute that assessed varieties face greater competition from cherries from the Pacific Northwest.[4] And while the Costas purport to dispute the fact the Cherry

---

[4] The Costas do not offer any evidence disputing this basic fact. The Secretary's separate statement summarizes testimony from the 2002 continuation hearing concerning late harvest competition from the Pacific Northwest. In their response and opposition to the Secretary's separate statement, next to this summary, the Costas stated: "Disputed: it was simply one proponent witness referred in the Secretary's alleged undisputed fact; and the testimony had nothing to do with any alleged justification for why only four varieties were being regulated and assessed, and not the rest of the California varieties, the testimony dealt with California varieties, as a whole being harvested and dumped into the market at the same time as the [Pacific Northwest] cherry." While the testimony did not specifically state *only* assessed varieties face competition from the Pacific Northwest

Board's promotional activities are timed to correspond with the peak production period for assessed varieties, they do so by improperly citing to their own interrogatory responses (Code Civ. Proc., § 2030.410; see also *Great American Ins. Co. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 450 ["responding party may not use its own interrogatory responses in its own favor"]) and to pages of a deposition transcript that were not made a part of the record. There is also undisputed evidence, including deposition testimony from the Costas' own employee, that the Cherry Board's research activities are directed towards benefitting the assessed varieties.

Based on undisputed evidence, we conclude the Cherry Marketing Program addresses needs specific to the assessed varieties. For this reason, as a matter of law, growers and packers of assessed and non-assessed varieties are not similarly situated for purposes of the Program.

**B.**

***Inspection Claim***

The Costas' inspection claim fares no better. As a preliminary matter, we note this claim is not a challenge to the Cherry Marketing Program, which prohibits the Advisory Board from enacting its own quality and/or grade standards. Instead, the Costas contend the Secretary's use of spot inspections "is palpably offensive to the Legislative intent" behind provisions requiring the Secretary to "[e]nsure uniformity in inspection." Specifically, the Costas cite sections 42651 [the Secretary "shall enforce this division"], 42652 ["refusal of any officer who is authorized under this division to carry out the orders and directions of the [Secretary] in the enforcement of this division is neglect of

---

during a late harvest season, a reasonable inference is that assessed varieties, which ripen significantly later than their non-assessed counterparts, face greater competition from Pacific Northwest cherries.

31

duty"], 42681, subdivision (c) [the Secretary may "[m]ake such other regulations as are reasonably necessary to secure uniformity in the enforcement of this division"], 42683 [the Secretary shall consider various factors in promulgating regulations concerning standard containers, lids, marking, sizing, consumer packages or packing requirements], and 42684 ["establishment and maintenance of minimum standards of quality and maturity for fruits, nuts, and vegetables is essential to ensure that products of acceptable and marketable quality will be available to the consumer"].

These provisions do not charge the Secretary with ensuring all California cherries are of uniform quality. Instead, the Legislature gave the Secretary authority to make regulations that are "reasonably necessary to secure uniformity *in the enforcement*" of California minimum grade and quality standards. (§ 42681, subd. (c), italics added.) The Secretary has done so. (See 3 CCR § 1370 et seq.) The Costas do not claim the Secretary's spot inspection program is not uniformly applied. They contend a factual dispute exists as to whether such inspections are inadequate under the law. However, there is no factual dispute concerning the spot inspection program itself. We have found nothing in the Food and Agriculture Code requiring the Secretary to employ a more stringent enforcement regime. Indeed, the fact subdivision (a) of section 42681 gives the Secretary authority to "[p]rescribe methods of selecting samples of lots or containers of fruits, nuts, and vegetables on a basis of size or other specific classification, which are reasonably calculated to produce by such sampling fair representations of the entire lots or containers which are sampled," reveals that inspection of representative samples is appropriate.

We conclude the use of spot inspections to enforce the standards does not violate the Secretary's obligation to ensure uniformity in inspections.

32

## DISPOSITION

The judgment is affirmed.  Karen Ross, as Secretary of the California Department of Food and Agriculture, shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                                      HOCH     , J.


We concur:


      RAYE     , P. J.


      ROBIE    , J.